

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00067-CV

IN THE INTEREST OF S.L.W., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court found by clear and convincing evidence

that Appellant R.W. (Father)

10.2.1      engaged in conduct or knowingly placed [S.L.W.] with persons who engaged in conduct which endanger[ed] [her] physical or emotional well-being . . . ; and

10.2.2      [f]ailed to comply with the provisions of a court Order that specifically established the actions necessary for [him] to obtain the return of [S.L.W.] who ha[d] been in the permanent or temporary managing conservatorship of the [Texas] Department of Family and Protective

---

[1]See Tex. R. App. P. 47.4.

Services [TDFPS] for not less than nine months as a result of [her] removal from the parent under Chapter 262 for the abuse or neglect of the child.

The trial court also found by clear and convincing evidence that termination of the parent-child relationship between Father and S.L.W. was in S.L.W.'s best interest. Based on its findings, the trial court terminated Father's parental relationship with S.L.W.

In three issues, Father contends that the evidence is legally insufficient to support the findings under subsections (E) and (O) and factually insufficient to support those findings as well as the best interest finding.[2] Because we hold that the evidence is legally and factually sufficient to support termination, we affirm the trial court's judgment.

## I. Statement of Facts

S.L.C. (Mother) met Father in 2003. At that time, Mother had two young sons with B.C., her husband (Husband). Husband had been in prison since February 2002. In 2004, the Atascosa County, Texas office of TDFPS opened a case because of concern about Mother and Father's drug use. But Mother testified that Father did not complete services at that time because "[t]hey didn't have anything against him. It was against [Mother]." On May 7, 2005, Mother and Father's first child together, D.W., a son, was born. In June 2006, all three boys were removed after the older two boys made an outcry that Father had

---

[2] *See* Tex. Fam. Code Ann. § 161.001(1) (E), (O), (2) (West Supp. 2012).

placed plastic bags on their heads, attempting to suffocate them. The three boys were placed with Husband's parents.

Father moved to San Antonio, and in November 2006, Mother delivered their second child together, G., a daughter, who was placed in foster care. Mother acknowledged that TDFPS was worried about her ability to protect the baby from Father because she had expressed disbelief about her elder sons' allegations against Father. At trial, she still did not believe that he had actually endangered them.

In March 2007, the children were all returned to Mother, who testified at the trial in the case before us that she was not then in a relationship with Father and that the judge in that case had recommended that Father have no contact with her older two sons. Nevertheless, the following month, when Mother was stopped and arrested for unpaid tickets, Father and the four children were all in the car with her. The children were removed again because of concerns about domestic violence between Mother and Father, and Husband's parents were awarded permanent managing conservatorship of the four children in May 2007. Mother last saw the children in 2008.

In February 2009, when Mother and Father were again not together, their third child together, R., a son, was born. Mother and R. both tested positive for marijuana and opiates at his birth. TDFPS removed R. In January 2010, R. was returned to Mother after she participated in services. In January or February 2010, Mother told Father about R. Father threatened to take R. to Fort Worth

3

from the Corpus Christi area where Mother and R were living. Mother reported his threat to the police on the advice of her caseworker. Also in February 2010, Father overdosed on Tylenol and was involuntarily committed for a short time. In March 2010, a pastor and his wife returned R. to TDFPS on Mother's behalf. In August 2010, Mother's and Father's parental relationship with R. was terminated, and he was adopted by nonrelatives.

In April 2011, Mother moved to Azle and lived with Father. In June 2011, she began prenatal care for S.L.W. On September 15, 2011, while Father was in jail for unpaid warrants, S.L.W., their fourth child and second daughter, was born. Her meconium tested positive for opiates and morphine. Father was released from jail a few days after her birth. At that time, Father and Mother were unemployed and living with Father's sister. Domestic violence, prior CPS history containing allegations of drug use, current allegations by family members of the couple's drug use, Mother's prenatal use of prescription pain medicine, and her apparent bouncing around among different doctors and hospitals for drugs were initial concerns of CPS. S.L.W. was removed on September 19, 2011 and placed with her foster family, Intervenors.

In September 2011, Father and Mother both appeared to be under the influence of drugs at a visit with S.L.W. He and Mother also failed to submit to a court-ordered hair strand drug test by the due date, October 10, 2011. Mother tested positive for methamphetamine in November 2011 and tested positive for

methamphetamine and amphetamine in February 2012. In February 2012, Father refused to be tested.

In March 2012, Father appeared for services at Merit Family Services for a psychosocial assessment. He tested positive for opiates. He also admitted to having engaged in verbal and emotional domestic abuse against Mother and to having anger control issues. The therapist also discussed concerns about pain medication addiction with Father "[b]ecause of the opiates in his system and the possible concerns that he was abusing substances." Father recognized the concern as appropriate. He was diagnosed with anxiety disorder and referred to JPS.

Mother also admitted to Merit staff that her relationship with Father included emotional and verbal abuse. She too was diagnosed with an anxiety disorder, and she too tested positive for opiates. At trial, she admitted that Father had been emotionally and verbally violent to her in the past and that she had been fearful for her safety and that of her children.

By August 20, 2012, Father had completed his initial court-ordered service plan except for drug tests. On August 20, 2012, the trial court, with CPS's agreement, was prepared to order a monitored return of S.L.W. to Mother and Father conditional on negative hair drug tests. Mother's test was negative, but Father tested positive for methamphetamine, amphetamine, and marijuana. The monitored return therefore did not happen, but, with TDFPS's agreement, the trial court extended the case for six months and ordered Mother and Father to

complete additional services. The caseworker testified that she told Father by telephone that he needed to complete the additional court-ordered services but that she did not provide a copy of the order to Father. Father's lawyer, among others, approved the order as to form. There was no testimony whether his lawyer provided Father with a copy of the order. After August 31, 2012, Father nevertheless failed to appear for a new drug screening and assessment, attended only one session of couples therapy, failed to submit Narcotics Anonymous sign-in sheets, and refused to submit to random drug tests.

Mother testified that she broke up with Father in December 2012, the month before trial, after he refused to take a drug test. His failure to take the drug test in December 2012 concerned Mother "[b]ecause if he didn't take his drug test, then that means he was hiding something and clearly wasn't wanting to be compliant and didn't want [S.L.W.] bad enough to do what he was supposed to do."

Mother testified that she believed that Father was abusing drugs at the time of trial because he refused to take a urine test. Mother testified that S.L.W. deserves a parent who is not on drugs. Mother testified that she did not believe it was in S.L.W.'s best interest to be in Father's presence and that she believed that being in his presence would endanger her physical health or emotional well-being.

Mother had been clean almost eleven months at the time of trial and did not intend to go back to Father. She admitted that at times she had put him

6

before her children. Mother also admitted that she and Father had broken up and gotten back together several times in the ten years that they had known each other.

Mother was due to have her fifth child with Father in April 2013. She believed that Father should have only supervised contact with that child.

In addition to his drug abuse, Father's anger was also a concern at trial. The licensed professional counselor who evaluated and counseled Mother and Father explained how Father's problems affect his ability to parent:

> He had trouble with anger. When there's trouble in a relationship, those conflicts can interfere with a parent's ability to meet their child's needs, [the] child could get injured during domestic inciden[ts]. They can be emotionally affected by these verbal conflicts that occur in relationships. There's many ways that it will interfere with effective parenting.

The counselor also explained how verbal and emotional abuse could affect a child: "It can affect their moods, their self-esteem, their sense of self-worth. They will feel insecure in the home and it can have multiple effects emotionally and psychologically for the child." Mother agreed that it is not healthy for a young child to be exposed to parents who "scream and yell and cuss" at each other.

Overall, the caseworker's chief lingering concern about Father at trial was his continued substance abuse. She did not believe that S.L.W. would be safe if she was returned to Father. The caseworker testified that she believed that termination is in S.L.W.'s best interest because S.L.W. "deserves a home that is

safe and stable, drug-free, [and] violence-free[,] and [she] d[id]n't feel that . . . [S.L.W.'s] biological parents [were] able to provide that for her."

According to Mother, Father visited S.L.W. pretty regularly until January 2013, unless he had to work, but on January 8 and January 15, 2013, he missed visits with S.L.W. even though he was in the parking lot and took Mother home from the January 15 visit. He told Mother that he missed the visit because "he had other things that he had to do" and that he was not sure that he would attend trial the next day. Although he had notice of trial, which began on January 16, 2013, Father did not appear in person; he was represented by counsel.

Father's CPS caseworker did not know where he was living at the time of trial; she had not spoken to him for about 43 days.

The evidence at trial shows that S.L.W. had been living with Intervenors and her foster brother since she was four days old. She called the foster mother "Mama." Intervenors thought of her as their daughter and expressed a wish to adopt her. S.L.W. was very close to her foster brother, who was seven and one-half months older than she and whom Intervenors were in the process of adopting.

The caseworker testified that S.L.W. was meeting her milestones timely. She had had no significant medical issues. Her foster mother testified that S.L.W. "took her first steps at nine months old and she walked at ten months old and she'[d] been unstoppable since then." She spoke her first sentence at just

over twelve months old in response to her foster mother's question, "[C]an you say[, ']I love you?'"

The caseworker testified that Intervenors had met S.L.W.'s emotional and physical needs since she began living in their home and further opined that they will be able to meet her future needs. The caseworker testified that the placement had been a good one for S.L.W. and that Intervenors had provided her with a "wonderful," "very stable," "very safe" home. Intervenors' home was child-proofed, and it had three bedrooms and two bathrooms, a fenced-in yard, and two dogs the children are close to. The caseworker also testified that Intervenors had a strong bond with S.L.W.

If Intervenors were to adopt S.L.W., they would be open to some level of contact with the biological parents, "depend[ing] on the biological parents and their current status of recovery." Intervenors already maintained contact with their foster son's birth mother. Intervenors would also tell S.L.W. about her adoption in an age-appropriate way.

Mother testified that while she wanted S.L.W. to come home to her, she knew that even if that did not happen, S.L.W. would "be okay." Mother testified that she could see that Intervenors provided a good home for S.L.W. Mother felt that S.L.W., who "d[id]n't really call [her] anything," "kn[ew] kind of who [Mother was], but not really, not like it should be." No one testified about any bond between S.L.W. and Father.

9

In closing arguments, Father supported the return of S.L.W. to Mother, who did not appeal the termination of her parental relationship with S.L.W.

## II. Endangering Conduct

In his first issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that he engaged in conduct or knowingly placed S.L.W. with persons who engaged in conduct which endangered her physical or emotional well-being. He contends that "it is virtually impossible to locate any evidence regarding any direct or indirect acts of 'endangerment' directed by [him] toward S.L.W." Yet, as we have explained many times,

> Endangerment means to expose to loss or injury, to jeopardize. . . .
>
> . . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.
>
> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. . . . A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. . . . As a general rule, conduct that subjects a child to a

10

life of uncertainty and instability endangers the child's physical and emotional well-being.[3]

A parent's mental state may also be relevant in deciding whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being.[4]  Finally, even when a parent makes significant, positive changes in behavior before trial, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."[5]

The evidence shows that Father overdosed before S.L.W.'s birth, engaged in a conscious course of drug abuse throughout the entire case, and had problems with anger, admitting to emotionally and verbally abusing Mother.  The evidence also shows that Mother's two older sons had reported that he had tried to suffocate them by encasing their heads in plastic bags.  Father's accomplishment of completing many or even almost all steps on the court-ordered service plan before the cancellation of the monitored return does not diminish the importance of his testing positive for methamphetamine, amphetamine, and marijuana several months before trial and his drug test

[3]*In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (citing *In re J.O.A.*, 283 S.W.3d 336, 345–46 (Tex. 2009), and *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.)).

[4]*In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

[5]*J.O.A.*, 283 S.W.3d at 346.

refusals up to the month before trial. Consequently, applying the appropriate standard of review and reviewing the evidence in the light most favorable to the verdict,[6] we hold that the evidence is legally sufficient to support the trial court's endangerment finding. Further, applying the appropriate standard to our review of all the evidence while giving due deference to the trial court's findings,[7] we hold that the evidence is factually sufficient to support the trial court's endangerment findings. We overrule Father's first issue.

## III. Best Interest

In his third issue, Father contends that the evidence is factually insufficient to support the trial court's best interest finding. While Father's lawyer cross-examined TDFPS's and Intervenors' witnesses, Father did not put on a case-in-chief—he did not call any witnesses or offer any exhibits. In closing arguments, Father supported the return of S.L.W. to Mother, but Mother did not appeal the trial court's termination of her parental rights. In addition to the evidence of Father's endangering conduct, which is relevant, we consider that there is no evidence about his own plans for S.L.W., how he planned to contribute to her care and upbringing (even if she were returned to Mother), or his bond with S.L.W. On the other hand, the record is replete with evidence that Intervenors'

---

[6]*See In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

[7]*See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 27–28 (Tex. 2002).

12

home was appropriate and beneficial, that S.L.W. had bonded with them and her foster brother, that she was safe and loved, and that Intervenors had an open mind about some type of contact with the birth parents depending on the birth parents' state of recovery. Thus, considering the *Holley* factors[8] and applying the appropriate standard to our review of all the evidence on S.L.W.'s best interest while giving due deference to the trial court's findings,[9] we hold that the evidence is factually sufficient to support the best interest finding. We overrule Father's third issue.

## IV. Conclusion

Because a best interest finding and a finding of only one ground alleged under section 161.001(1) of the family code are sufficient to support a judgment of termination,[10] we do not reach Father's second issue, which challenges the finding under subsection (O).[11] Consequently, having overruled Father's dispositive issues, we affirm the trial court's judgment.

---

[8]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[9]*See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 27–28.

[10]*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[11]*See* Tex. R. App. P. 47.1.

PER CURIAM

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED:  August 8, 2013